## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

**Case No. _____**

| | |
|---|---|
| BlackBerry Limited | |
|        Plaintiff, | |
| vs. | |
| BLU Products, Inc. | |
|        Defendant. | |

## BLACKBERRY'S COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff BlackBerry Limited ("BlackBerry"), for its Complaint against Defendant BLU Products, Inc. ("BLU"), alleges as follows:

## INTRODUCTION

1.     BlackBerry revolutionized the mobile communications industry.  Its innovative, cutting-edge products changed the way millions of people around the world connect, converse, and share digital information.

2.     BlackBerry was founded in 1984 in Waterloo, Ontario by two engineering students, Mike Lazaridis and Douglas Fregin.  In its early years, the company—then named Research In Motion ("RIM")—focused its inventive energies on wireless data transmission.

3.     From its modest beginnings more than 30 years ago, BlackBerry has gone on to offer a portfolio of award-winning products, services, and embedded technologies to tens of millions of individual consumers and organizations around the world, including governments, educational institutions, and over 90% of Fortune 500 companies.  By transforming the way people communicate, BlackBerry laid a foundation for today's multibillion-dollar modern smartphone industry.

4.      Throughout its history, BlackBerry has demonstrated a commitment to innovation, including through its investments in research and development, which have totaled more than $5.5 billion over the past five years.  BlackBerry has protected the technical innovations resulting from these investments, including through seeking patent protection, and BlackBerry owns rights to a wide array of patented technologies in the United States and worldwide.

5.      As a result of its innovative efforts, BlackBerry built a substantial portfolio of patents declared essential to critical mobile telecommunications standards that enable the widely used 2G, 3G, and LTE communications networks[1] implemented in the United States. BlackBerry developed these technologies and then helped develop these standards in conjunction with the Third Generation Partnership Project ("3GPP").

6.      As part of the standard development process, BlackBerry committed to license its patents essential to these standards (standard-essential patents or "SEPs") on terms and conditions that are fair, reasonable, and non-discriminatory ("FRAND").  SEPs are particularly powerful patents because all implementers must practice them in order be able to make, use, or sell standard-compliant products.  FRAND licenses are therefore used in connection with SEPs to strike a balance that ensures SEP owners receive appropriate compensation for their intellectual property rights but also allows for implementers to widely adopt the standard.

7.      BLU infringes multiple BlackBerry patents by using, without authorization, BlackBerry's proprietary technology in a number of BLU's commercial products, including mobile phones, smartphones, tablets, and software for mobile communication devices.

---

[1] This standard technology is set forth in at least the following specification numbers:  4G:  3GPP TS 23.122, 23.401, 24.229, 24.301, 36.211, 36.212, 36.213, 36.300, 36.321, 36.322, 36.331; 3G:  3GPP TS 23.002, 25.133, 25.201, 25.211, 25.212, 25.213, 25.214, 25.215, 25.301, 25.309, 25.321, 25.331, 25.401, 25.433.

8.      As a result of its infringement, BLU has earned substantial revenue selling 2G, 3G, and LTE-compliant products that use BlackBerry's technology.  BLU makes, sells, uses, offers to sell, markets, and/or imports numerous smartphones compatible with the 2G, 3G, and LTE standard throughout the United States without a license from BlackBerry.

9.      BlackBerry offered BLU a license on FRAND terms, but BLU never responded. Despite efforts by BlackBerry to negotiate, BLU has persisted in importing, selling, and offering for sale a substantial volume of standard-compliant products that use BlackBerry's SEP technology without a license.  Based on these actions, BlackBerry brings claims for patent infringement against BLU under 35 U.S.C. § 271, *et seq.*

## THE PARTIES

10.     Plaintiff BlackBerry Limited is a Canadian company with its principal place of business at 2200 University Avenue East, Waterloo, Ontario, Canada N2K 0A7.

11.     On information and belief, Defendant BLU Products, Inc. is a Delaware corporation with its principal place of business at 10814 N.W. 33rd Street, Building 100, Doral, Florida 33172.



On information and belief, BLU Products, Inc. may be served through its registered agent, Bernard L. Egozi of Egozi & Bennett, P.A. 2999 NE 191st, Suite 407, Aventura, FL 33180.  BLU

operates and/or owns the website located at http://bluproducts.com/.

## JURISDICTION, VENUE, AND INTRADISTRICT ASSIGNMENT

12.     This is a civil action for patent infringement under the patent laws of the United

States, 35 U.S.C. § 101, *et seq*.  This Court has subject matter jurisdiction over this action

pursuant to 28 U.S.C. §§ 1331, 1332, 1338(a), and 1367.

13.     This Court also has personal jurisdiction over BLU for at least the following

reasons: (1) BLU's principal place of business is located in this District; and (2) BLU regularly

does business or solicits business, engages in other persistent courses of conduct, and/or derives

substantial revenues from products and/or services provided to individuals in Florida.

14.     BLU committed and continues to commit acts of infringement in violation of 35

U.S.C. § 271.  BLU made, used, offered for sale, sold, marketed, and/or imported infringing

products in the State of Florida, including in this District.  BLU's acts cause injury to

BlackBerry, including within this District.

15.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c) and

1400(b) for at least the following reasons: (1) BLU's principal place of business is located in

this District; and (2) BLU regularly does business or solicits business, engages in other

persistent courses of conduct, and/or derive substantial revenues from products and/or services

provided to individuals in Florida.

## FACTUAL BACKGROUND

**A.     BlackBerry's Innovation and Industry Recognition**

16.     BlackBerry is a global leader in the mobile communications industry.  Through

its significant investment in research and development over the past 30 years, BlackBerry has

developed innovative, cutting-edge technologies that have changed the face of

telecommunications.

17.     In the late 1990s, BlackBerry began to release a series of game-changing handheld mobile devices that enabled users to send and receive email and messages on the go, without needing to be tethered to a modem or a desktop computer.  The innovative nature of the 1998 RIM 950 Wireless Handheld, for example, was instantly recognized, garnering both an Editor's Choice Award from CNET and Andrew Seybold's Outlook Award.  In particular, the press praised the RIM 950's keyboard for its advanced ergonomic features, including an easy-to-type-on keyboard layout despite the device's miniature size.

18.     In 2002, BlackBerry released the BlackBerry 6710 and 6720—the first BlackBerry devices capable of both sending emails and making phone calls, and some of the earliest smartphones released in the United States.  The next year, BlackBerry introduced smartphone models that added built-in audio hardware and color screens.  Since those first smartphones, BlackBerry has continued to offer handheld wireless products incorporating its proprietary technologies, including those fundamental and essential to wireless communication standards.

19.     BlackBerry's technologic innovations continue to this day, as embodied in the latest iterations of BlackBerry's mobile devices—including the BlackBerry Classic, Leap, Passport, and PRIV.

20.     Each successive iteration of BlackBerry's wireless devices has received significant unsolicited coverage in the media.  For example, GSMA—the largest and most well-known association of mobile operators—recognized BlackBerry's devices as "chang[ing] the face of communications."  Business Insider recognized BlackBerry as "the best at making keyboard phones."  Thomson Reuters named BlackBerry one of the World's Top 100 Most

Innovative Organizations, based largely on the number of "important patents" BlackBerry has. In 2015, Forrester Research crowned BlackBerry as a "leader in mobile management" based on BlackBerry's focus in security software and mobile solutions.

21.     BlackBerry's handheld devices have won widespread industry acclaim for both their unique design and their performance.  BlackBerry mobile devices have received dozens of industry awards, including the GSMA Chairman's Award, InfoWorld Magazine's Product of the Year Award, PC World's World Class Award, the Network Industry Award for Best New Mobile Communications Product, the BusinessWeek Best Product of the Year award, Digit Magazine's "World's Best Mobile OS" award, Security Products "Govies" Government Security Award, and PC Magazine's Best Products of the Year Award.

22.     This industry acclaim for BlackBerry's innovations continues to this day.  For example, in 2015 BlackBerry's Passport was awarded the prestigious Red Dot "Best of the Best" award for innovative product design (from thousands of total entries).  Similarly, in 2016, BlackBerry's PRIV was awarded the Red Dot "Design Award" for best product design.

23.     In the course of developing these ground-breaking devices, BlackBerry built a portfolio of approximately 40,000 patents and patent applications covering numerous fields of technology including mobile communication, radio frequency communication techniques, processors, power management, and many other areas.

**B.     BlackBerry's Patents**

        **1.     U.S. Patent No. 7,969,924**

24.     U.S. Patent No. 7,969,924 ("'924 patent"), entitled "Method and Apparatus for State/Mode Transitioning," was duly and legally issued on June 28, 2011.  BlackBerry Limited is the owner by assignment of all right, title, and interest in and to the '924 patent, including without limitation the right to sue and recover for past infringement thereof.  A copy of the '924

patent is attached as Exhibit A.

### 2.     U.S. Patent No. 8,483,060

25.     U.S. Patent No. 8,483,060 ("'060 patent") is entitled "Method for Configuring a Telecommunication System," and issued on July 9, 2013.  BlackBerry Limited is the owner by assignment of all right, title, and interest in and to the '060 patent, including without limitation the right to sue and recover for past infringement thereof.  A copy of the '060 patent is attached as Exhibit B.

### 3.     U.S. Patent No. 8,406,118

26.     U.S. Patent No. 8,406,118 ("'118 patent") is entitled "Scattered Pilot Pattern and Channel Estimation Method for MIMO-OFDM Systems," and issued on March 26, 2013. BlackBerry Limited is the owner by assignment of all right, title, and interest in and to the '118 patent, including without limitation the right to sue and recover for past infringement thereof.  A copy of the '118 patent is attached as Exhibit C.

### 4.     U.S. Patent No. 8,472,567

27.     U.S. Patent No. 8,472,567 ("'567 patent") is entitled "Detecting the Number of Transmit Antennas in a Base Station," and issued on June 25, 2013.  BlackBerry Limited is the owner by assignment of all right, title, and interest in and to the '567 patent, including without limitation the right to sue and recover for past infringement thereof.  A copy of the '567 patent is attached as Exhibit D.

### 5.     U.S. Patent No. 8,265,034

28.     U.S. Patent No. 8,265,034 ("'034 patent") is entitled "Method and System for Signaling Connection Release Indication," and issued on September 11, 2012.  BlackBerry Limited is the owner by assignment of all right, title, and interest in and to the '034 patent, including without limitation the right to sue and recover for past infringement thereof.  A copy

of the '034 patent is attached as Exhibit E.

### 6.     U.S. Patent No. 8,625,506

29.     U.S. Patent No. 8,625,506 ("'506 patent") is entitled "Method and System for Signaling Connection Release Indication," and issued on January 7, 2014.  BlackBerry Limited is the owner by assignment of all right, title, and interest in and to the '506 patent, including without limitation the right to sue and recover for past infringement thereof.  A copy of the '506 patent is attached as Exhibit F.

### 7.     U.S. Patent No. 7,933,355

30.     U.S. Patent No. 7,933,355 ("'355 patent") is entitled "Systems, Devices, and Methods for Training Sequence, Transmission and Reception," and issued on April 26, 2011. BlackBerry Limited is the owner by assignment of all right, title, and interest in and to the '355 patent, including without limitation the right to sue and recover for past infringement thereof.  A copy of the '355 patent is attached as Exhibit G.

### 8.     U.S. Patent No. 7,050,413

31.     U.S. Patent No. 7,050,413 ("'413 patent") is entitled "Information Transmission Method, Mobile Communications System, Base Station and Mobile Station in which Data Size of Identification Data Is Reduced," and issued on May 23, 2006.  BlackBerry Limited is the owner by assignment of all right, title, and interest in and to the '413 patent, including without limitation the right to sue and recover for past infringement thereof.  A copy of the '413 patent is attached as Exhibit H.  (The '924, '060, '118, '567, '034, '506, '355, and '413 patents collectively referred to as the "Asserted Patents".)

## C.     Cellular Standards and the FRAND Commitment

32.     Many of BlackBerry's patents, including the Asserted Patents, cover aspects of industry standards developed by 3GPP through a collaborative process in which European

Telecommunications Standards Institute ("ETSI") and other international standard-setting organizations ("SSOs") collaborate to create and improve global standards for the telecommunications industry.  3GPP operates as an umbrella SSO that produces and maintains the technologies that enable the "second", "third", and "fourth" generations of wireless telecommunications technology ("2G", "3G", and "LTE", respectively).  LTE technology, which evolved from 3G, aims to increase capacity and speed.  In particular, the LTE standard represents the latest advances in wireless telecommunications technology and is credited with many technical innovations that have greatly enhanced user experience, including a dramatic increase in data throughput and system performance compared to 3G technology.  The family of 3GPP radio access technologies shares a number of synergies and certain features may be designed to operate across, or to enable interworking between 2G, 3G, and LTE.  Mobile devices and infrastructure equipment are also commonly "multi-mode," *i.e.*, are compatible with multiple generations of 3GPP's radio access technologies.  For example, LTE phones are commonly also capable of communicating using 3G technologies.

33.    Similarly, LTE and 3G technologies evolved from 2G technologies and multi-mode devices supporting LTE and 3G are also commonly compatible with 2G technologies.

34.    Cellular standards enable interoperability, *i.e.*, the ability of devices and equipment made by different manufacturers to communicate and work together in a cellular network.  In order for mobile devices and telecommunications infrastructure equipment to be commercially viable in the United States and most of the world today, it is essential that such devices and equipment comply with 3GPP standards.

35.    3GPP maintains and approves standards through a collaborative process in which its members submit technical proposals for establishing or improving aspects of a standard.

These proposals are evaluated, refined, tested, and ultimately approved or rejected by technical committees of 3GPP.  The resulting 3GPP technical specifications are incorporated by ETSI and other SSOs into relevant standards.

36.     Once a particular technology is incorporated into a standard, manufacturers of telecommunications devices and equipment must integrate the technology into their products to comply with the standard.  Because it is common for SSO members to own patents covering the technology they contribute to standards, organizations like ETSI have created policies that seek to ensure those patents will be available for manufacturers to license on FRAND terms and conditions.  For example, ETSI's Intellectual Property Right ("IPR") Policy requires members to disclose patents they believe are or may become "essential" to complying with a standard and declare whether they are prepared to grant irrevocable licenses on FRAND terms and conditions.

37.     ETSI's IPR Policy defines "essential" as follows:

> "ESSENTIAL" as applied to IPR means that it is not possible on technical (but not commercial) grounds, taking into account normal technical practice and the state of the art generally available at the time of standardization, to make, sell, lease, otherwise dispose of, repair, use or operate EQUIPMENT or METHODS which comply with a STANDARD without infringing that IPR.  For the avoidance of doubt in exceptional cases where a STANDARD can only be implemented by technical solutions, all of which are infringements of IPRs, all such IPRs shall be considered ESSENTIAL.

Exhibit I at 41, § 15(6).

38.     ETSI members who disclose their SEPs are thus invited to declare whether they are ready to license them, upon request, to implementers of the 3GPP standards on FRAND terms and conditions.  The declaration forms ETSI members may use to disclose SEPs state:

> To the extent that the IPR(s) disclosed in the attached *IPR Information Statement Annex* are or become, and remain ESSENTIAL in respect of the

---

**BLACKBERRY'S COMPLAINT FOR PATENT INFRINGEMENT**

> ETSI Work Item, STANDARD and/or TECHNICAL SPECIFICATION identified in the attached *IPR Information Statement Annex*, the Declarant and/or its AFFILIATES are (1) prepared to grant irrevocable licenses under this/these IPR(s) on terms and conditions which are in accordance with Clause 6.1 of the ETSI IPR Policy; and (2) will comply with Clause 6.1bis of the ETSI IPR Policy.

*E.g., id.* at 43.

39.     Many other SSOs require similar commitments from members who disclose patents that are or may become essential to practicing relevant standards.

40.     ETSI declarations create binding contractual commitments with ETSI to which other ETSI members and implementers of the 3GPP standards are third-party beneficiaries.

41.     The FRAND requirement is intended to ensure that SEP owners receive appropriate compensation for their intellectual property rights while preventing attempts to extract from implementers more favorable license terms than SEP owners would have obtained had their patents not been declared essential.

42.     BlackBerry and its affiliates are members of over thirty SSOs and have forged many industry alliances to promote the development of information and communications technology.  BlackBerry and its affiliates have submitted many proposals to various standards organizations.  BlackBerry and its affiliates have been active participating members of ETSI since 1999 and have made thousands of contributions to 3GPP standards, including the 2G, 3G, and LTE wireless standards.

43.     BlackBerry, on its behalf and on behalf of its affiliates, has disclosed to ETSI over two hundred patent families that are or may become essential to practicing one or more 3GPP standards.  BlackBerry, on its behalf and on behalf of its affiliates, has committed to license, and has licensed to multiple companies, its standard-essential patents and those of its affiliates ("BlackBerry's SEP portfolio") on FRAND terms and conditions according to ETSI's

IPR Policy.  BlackBerry's SEP portfolio, particularly as it relates to the 2G, 3G, and LTE standards, is extremely valuable within these standards and the industry.

**D.      Notice Letters from BlackBerry to BLU Products**

44.     On November 21, 2015, BlackBerry notified BLU of BlackBerry's belief that BLU is infringing BlackBerry's U.S. patents through its manufacture and sale of mobile phones and tablets that are compliant with, among others, the 2G, 3G, and LTE wireless standards.  In its notification, BlackBerry provided BLU with a non-exhaustive list of standards that BLU practices and a non-exhaustive list of BlackBerry's U.S. patents associated with those standards that BlackBerry believes BLU's products infringe.

45.     BlackBerry additionally offered BLU the opportunity to license the patents on FRAND terms and requested a meeting at BLU's headquarters to discuss the potential for licensing the technology to BLU.  BlackBerry also offered to (1) explain in greater detail the basis of BlackBerry's belief that BLU is infringing the BlackBerry patents and (2) present a specific, written offer for a license on FRAND terms, including the royalty amount.

46.     BlackBerry asked for a response to its November 21, 2015 letter by December 4, 2015.

47.     BLU did not respond to BlackBerry's November 21, 2015 letter by December 4, 2015.

48.     On December 8, 2015, BlackBerry sent BLU a second notice letter, stating that BLU had failed to respond to the November 21, 2015 letter and that the lack of response from BLU indicated to BlackBerry that BLU was not interested in pursuing a license with BlackBerry.

49.     Despite BlackBerry's December 8, 2015 letter, BLU did not pursue a license

from BlackBerry or otherwise engage in licensing negotiations.

**E.      BLU's Sales of 3GPP Standard-Compliant Products**

50.      BLU has earned substantial revenue selling 2G, 3G, and LTE-compliant products that use BlackBerry's technology.  Those sales have propelled BLU to become, in its own words "one of the fastest growing mobile phone manufacturers in the world."  *About Us*, BLU PRODUCTS, http://bluproducts.com/into-blu/about-us (last visited August 14, 2016), Exhibit J.

51.      BLU makes, sells, uses, offers to sell, markets, and/or imports numerous smartphones compatible with the LTE standards, as well as tablets and related devices, in(to) the Southern District of Florida and throughout the United States without a license from BlackBerry.  BLU's LTE-enabled products are designed to operate on U.S. cellular networks with LTE capabilities.  BLU markets LTE-capability as a key feature of its products.

52.      BlackBerry is informed and believes, and thereon alleges, that the BLU devices that are designed to operate on LTE, 3G, and 2G networks and are compliant with all necessary 2G, 3G, and LTE standards include, but are not limited to, the following models: Dash X Plus LTE, Energy X LTE, Life Mark, Life One X, Pure XL, Studio Energy 2, Studio One, Studio One Plus, Studio Touch, Studio X Mini, Vivo 5, Vivo XL, Energy XL, R1 HD (hereinafter, the "Accused LTE Products").

53.      BLU makes, sells, uses, offers to sell, markets, and/or imports numerous smartphones compatible with the 3G standards, as well as tablets and related devices, in(to) the Southern District of Florida and throughout the United States without a license from BlackBerry.  BLU's 3G-enabled products are designed to operate on U.S. cellular networks with 3G capabilities.  BLU markets 3G capability as a key feature of its products.

54.      BlackBerry is informed and believes, and thereon alleges, that the BLU devices

that are designed to operate on 3G and 2G networks and are compliant with all necessary 2G and 3G standards, other than the Accused LTE Products, include, but are not limited to, the following models: Advance 4.0, Advance 4.0 L, Advance 4.0 L2, Advance 4.5, Advance 5.0, Amour, Dash, Dash 3.2, Dash 3.5, Dash 4.0, Dash 4.5, Dash 5.0, Dash 5.0+, Dash 5.5, Dash C Music, Dash L, Dash L2, Dash M, Dash M2, Dash Music 4.0, Dash X, Dash X Plus, Dash X2, Energy X, Energy X Plus, Energy X2, Life 8, Life 8 XL, Life One M, Life Play, Life Play 2, Life Play Mini, Life Play S, Life Play X, Life Pro, Life Pure, Life Pure Mini, Life View, Life View 8.0 (Tablet), Life View Tab (Tablet), Life X8, Neo 3.5, Neo 4.5, Neo Energy Mini, Neo X, Neo X Plus, Neo XL, Selfie, Sport 4.5, Star 4.5, Studio 5.0 C, Studio 5.0 C HD, Studio 5.0 II, Studio 5.0 S II, Studio 5.5, Studio 5.5 C, Studio 5.5 HD, Studio 5.5 S, Studio 6.0 HD, Studio 7.0, Studio 7.0 II, Studio C, Studio C 5+5, Studio C HD, Studio C Mini, Studio C Super Camera, Studio Energy, Studio G, Studio G Plus, Studio M HD, Studio Selfie 2, Studio X, Studio X 5, Studio X 6, Studio X Plus, Studio XL, Tank 4.5, Touchbook G7, Vivo 4.3, Vivo 4.65 HD, Vivo 4.8 HD, Vivo Air, Vivo IV, Vivo Selfie, Energy X Mini, Grand 5.5 HD, Neo 5.0, Studio G HD, Energy Diamond Mini (hereinafter, the "Accused 3G Products") (the Accused 3G Products and Accused LTE Products collectively the "Accused Products").

55.     As detailed further below, BLU's Accused Products use technology protected by BlackBerry's Asserted Patents.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### (Infringement of U.S. Patent No. 7,969,924)

56.     BlackBerry realleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

57.     On information and belief, BLU has directly infringed and is continuing to

directly infringe the '924 patent, either literally or under the doctrine of equivalents, by making, using, selling, offering for sale, marketing, and/or importing in the United States and in this Judicial District, products, software, and/or services that incorporate or make use of one or more of the inventions covered by the '924 patent, including but not limited to products or software supporting the 3G standard, including 3GPP TS 25.331 (v8.14.0 and subsequent releases and versions).  The Accused Products therefore infringe at least claims 1 and 23 of the '924 patent.

58.     For example, on information and belief, the BLU Vivo XL contains the features and functionality designed and used to comply with the 3G standard.



*See, e.g.*, *BLU Vivo XL Sales Guide* 20, http://bluproducts.com/index.php/android-phones (last visited August 14, 2016) (attached as Exhibit K).

59.     On information and belief, the Accused Products, including the BLU Vivo XL, comply with 3GPP TS 25.331 (v8.14.0 and subsequent releases and versions) when implementing the 3G standard.

60.     On information and belief, by complying with the 3G standard and the 3GPP TS 25.331 (v8.14.0 and subsequent releases and versions), the Accused Products, including the BLU Vivo XL, satisfy each and every element of one or more of the claims '924 patent, including without limitation, claims 1 and 23.

61.     Claim 1 of the '924 patent recites:

A method comprising: reading a system information message received from a
      network; ("'924 Element 1A")

determining, at a user equipment, if the system information message includes an
      inhibit transition indication; ("'924 Element 1B")

determining, at the user equipment, if no further data is expected; and ("'924
      Element 1C")

if the system information message includes an inhibit transition indication, and if
      no further data is expected: ("'924 Element 1D")

transmitting an indication message from the user equipment to the network, the
      indication message including a cause. ("'924 Element 1E")

62.     The Accused Products satisfy '924 Element 1A of claim 1 of the '924 patent,

literally or under the doctrine of equivalents, for example, by operating in accordance with

section 8.1 of 3GPP TS 25.331 v8.14.0, including sections 8.1.1.1 and 8.1.1.3.

63.     The Accused Products satisfy '924 Element 1B of claim 1 of the '924 patent,

literally or under the doctrine of equivalents, for example, by operating in accordance with

section 8.1 of 3GPP TS 25.331 v8.14.0 (including sections 8.1.1.6, 8.1.1.6.1, 8.1.14 and

8.1.14.2), and section 10 of 3GPP TS 25.331 v8.14.0 (including sections 10.2.48.8 and

10.3.3.43).

64.     The Accused Products satisfy '924 Element 1C of claim 1 of the '924 patent,

literally or under the doctrine of equivalents, for example, by operating in accordance with

section 8.1 of 3GPP TS 25.331 v8.14.0, including section 8.1.14 and 8.1.14.2.

65.     The Accused Products satisfy '924 Element 1D of claim 1 of the '924 patent,

literally or under the doctrine of equivalents, for example, by operating in accordance with

section 8.1 of 3GPP TS 25.331 v8.14.0, including sections 8.1.1.6, 8.1.1.6.1, 8.1.14 and

8.1.14.2.

66.    The Accused Products satisfy '924 Element 1E of claim 1 of the '924 patent, literally or under the doctrine of equivalents, for example, by operating in accordance with section 8.1 of 3GPP TS 25.331 v8.14.0, including section 8.1.14 and 8.1.14.2.

67.    Claim 23 of the '924 patent recites:

A user equipment comprising: a processor configured to: read a system information message received from a network; ("'924 Element 23A")

determine if the system information message includes an inhibit transition indication; ("'924 Element 23B")

determine if no further data is expected; and ("'924 Element 23C")

if the system information message includes the inhibit transition indication, and if no further data is expected, ("'924 Element 23D")

transmit an indication message from the user equipment to the network, the indication message including a cause. ("'924 Element 23E")

68.    The Accused Products satisfy '924 Element 23A of claim 23 of the '924 patent, literally or under the doctrine of equivalents, for example, by being configured to operate in accordance with section 8.1 of 3GPP TS 25.331 v8.14.0, including sections 8.1.1.1 and 8.1.1.3.

69.    The Accused Products satisfy '924 Element 23B of claim 23 of the '924 patent, literally or under the doctrine of equivalents, for example, by being configured to operate in accordance with section 8.1 of 3GPP TS 25.331 v8.14.0 (including sections 8.1.1.6, 8.1.1.6.1, 8.1.14 and 8.1.14.2), and section 10 of 3GPP TS 25.331 v8.14.0 (including sections 10.2.48.8 and 10.3.3.43).

70.    The Accused Products satisfy '924 Element 23C of claim 23 of the '924 patent, literally or under the doctrine of equivalents, for example, by being configured to operate in accordance with section 8.1 of 3GPP TS 25.331 v8.14.0, including section 8.1.14 and 8.1.14.2.

71.    The Accused Products satisfy '924 Element 23D of claim 23 of the '924 patent, literally or under the doctrine of equivalents, for example, by being configured to operate in

accordance with section 8.1 of 3GPP TS 25.331 v8.14.0, including sections 8.1.1.6, 8.1.1.6.1, 8.1.14 and 8.1.14.2.

72.     The Accused Products satisfy '924 Element 23E of claim 23 of the '924 patent, literally or under the doctrine of equivalents, for example, by being configured to operate operating in accordance with section 8.1 of 3GPP TS 25.331 v8.14.0, including section 8.1.14 and 8.1.14.2.

73.     On or about November 21, 2015, BlackBerry notified BLU that it infringed the '924 patent by providing a list of patents required to practice, *inter alia*, the 2G, 3G, and LTE standards.  The notice contained an offer to license the '924 patent on fair, reasonable, and nondiscriminatory terms.  BLU became aware of the '924 patent at least as of this notice.

74.     On information and belief, BLU also induces infringement of at least claims 1 and 23 of the '924 patent.  BLU's Accused Products as sold are specifically configured to infringe BlackBerry's '924 patent as described above.  BLU actively instructs its customers on how to use its products, including through product manuals and advertising.  When used as instructed, BLU's customers use its products to practice the methods and use the apparatus of the '924 patent.  BLU's customers thereby directly infringe, either literally or under the doctrine of equivalents, the '924 patent.  For example, the Accused Products practice the '924 patent when an end user uses his or her device in an ordinary manner, such as to transmit or receive data over a 3G communication network.  The BLU Vivo XL sales guide, for example, informs and instructs users how to use the phone with a 3G network in an infringing manner.[2]

75.     BLU knew of the '924 patent, or should have known of the '924 patent but was willfully blind to its existence, since at least its incorporation into the 3G standard and its

---

[2] *See, e.g.*, *BLU Vivo XL Sales Guide* 20, Exhibit K.

disclosure to 3GPP and ETSI.  BLU was made aware of its infringement through a notice letter sent from BlackBerry on November 21, 2015.  Additionally, BLU has had actual knowledge of the '924 patent since at least as early as the filing and/or service of this Complaint.

76.     As of the date of its earliest awareness of the '924 patent, BLU knew of the '924 patent and knew that its customers' actions taken during the ordinary and intended use of the Accused Products would constitute infringement of the '924 patent.  Alternatively, BLU understood that there is a high probability that its customers would infringe the '924  patent but remained willfully blind to the infringing nature of its customers' actions taken during the ordinary and intended use of the Accused Products.

77.     BLU's infringement of the '924 patent has been and continues to be willful, and BLU's conduct renders this case exceptional under 35 U.S.C. § 285.  BlackBerry provided BLU notice on November 21, 2015, identifying the '924 patent and the infringement by BLU's products.  Despite this notice, BLU failed to negotiate in good faith and has willfully and deliberately continued infringing the claims of the '924 patent to the present day.

78.     Additional allegations regarding BLU's knowledge of the '924 patent and willful infringement likely will have evidentiary support after a reasonable opportunity for discovery.

79.     By its actions, BLU has injured BlackBerry and is liable to BlackBerry for infringement of the '924 patent pursuant to 35 U.S.C. § 271.

## SECOND CAUSE OF ACTION
### (Infringement of U.S. Patent No. 8,483,060)

80.     BlackBerry realleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

81.     On information and belief, BLU has directly infringed and is continuing to directly infringe the '060 patent, either literally or under the doctrine of equivalents, by making,

using, selling, offering for sale, marketing, and/or importing in the United States and in this Judicial District, products, software, and/or services that incorporate or make use of one or more of the inventions covered by the '060 patent, including but not limited to products or software supporting the 3G standard, including 3GPP TS 25.212 (v6.10.0 and subsequent releases and versions), TS 25.331 (v6.25.0 and subsequent releases and versions), and TS 25.401 (v6.9.0 and subsequent releases and versions) (collectively the "Accused '060 Technical Specifications"). The Accused Products therefore infringe at least claims 1 and 14 of the '060 patent.

82.     For example, on information and belief, the BLU Vivo XL contains the features and functionality designed and used to comply with the 3G standard.



*See, e.g.*, *BLU Vivo XL Sales Guide* 20, Exhibit K.

83.     On information and belief, by complying with the 3G standard and Accused '060 Technical Specifications, the Accused Products, including the BLU Vivo XL, satisfy each and every element of one or more of the claims '060 patent, including without limitation, claims 1 and 14.

84.     Claim 1 of the '060 patent recites:

A method for a communication terminal communicating with a network entity using a plurality of transport channels, the method comprising: ("'060 Preamble 1A")

receiving for each of said transport channels a first parameter relating to a rate matching ratio for the transport channel; ("'060 Element 1B")

receiving data with a rate determined by a rate matching process; and ("'060 Element 1C")

determining a variation between a number of bits of each of said transport channels before and after the rate matching process based on a second parameter indicating a maximum physical rate corresponding to a transport channel composite and at least one of the received first parameters.  ("'060 Element 1D")

85.     To the extent the preamble is considered a limitation, the '060 Accused Products satisfy '060 Preamble 1A of claim 1 of the '060 patent, literally or under the doctrine of equivalents, for example, by operating in accordance with section 4.2 of 3GPP TS 25.212 v6.10.0, including as further explained by figure 2 and associated text, and as further defined by section 3 of 3GPP TS 25.212 v6.10.0 and by section 3 of 3GPP TS 25.401 v6.9.0.

86.     The Accused Products satisfy '060 Element 1B of claim 1 of the '060 patent, literally or under the doctrine of equivalents, for example, by operating in accordance with section 10.2 of 3GPP TS 25.331 (including section 10.2.33), section 10.3.5 of 3GPP TS 25.331 v6.25.0 (including sections 10.3.5.1, 10.3.5.11, and 10.3.5.23), section 4.2 of 3GPP TS 25.212 v6.10.0 (including sections 4.2.7 and 4.2.7.2), and as further defined by section 3.2 of 3GPP TS 25.212 v6.10.0.

87.     The Accused Products satisfy '060 Element 1C of claim 1 of the '060 patent, literally or under the doctrine of equivalents, for example, by operating in accordance with section 4.2 of 3GPP TS 25.212 v6.10.0, including sections 4.2.7 and 4.2.7.2.

88.     The Accused Products satisfy '060 Element 1D of claim 1 of the '060 patent, literally or under the doctrine of equivalents, for example, by operating in accordance with section 4.2 of 3GPP TS 25.212 v6.10.0, including sections 4.2.7 and 4.2.7.2.

89.     Claim 14 of the '060 patent recites:

A communication terminal for communicating using a plurality of transport channels, the communication terminal comprising: ("'060 Preamble 14")

a receiver configured to receive for each of said transport channels a first parameter relating to a rate matching ratio for the transport channel ("'060 Element 14A")

and receive data with a rate determined by a rate matching process, and ("'060 Element 14B")

said communication terminal configured to: determine a variation between a number of bits of each of said transport channels before and after the rate matching process based on a second parameter indicating a maximum physical rate corresponding to a transport channel composite and at least one of the received first parameters. ("'060 Element 14C")

90.     To the extent the preamble is considered a limitation, the Accused Products satisfy the '060 Preamble 14 of claim 14 the '060 patent, literally or under the doctrine of equivalents, for example, by being configured to operate in accordance with section 4.2 of 3GPP TS 25.212 v6.10.0, including as further explained by figure 2 and associated text, and as further defined by section 3 of 3GPP TS 25.212 v6.10.0 and section 3 of 3GPP TS 25.401 v6.9.0.

91.     The Accused Products satisfy '060 Element 14A of claim 14 of the '060 patent, literally or under the doctrine of equivalents, for example, by being configured to operate in accordance with section 10.2 of 3GPP TS 25.331 v6.25.0 (including section 10.2.33), section 10.3.5 of 3GPP TS 25.331 v6.25.0 (including sections 10.3.5.1, 10.3.5.11, and 10.3.5.23), section 4.2 of 3GPP TS 25.212 v6.10.0 (including sections 4.2.7 and 4.2.7.2), and as further defined by section 3.2 of 3GPP TS 25.212 v6.10.0.

92.     The Accused Products satisfy '060 Element 14B of claim 14 of the '060 patent, literally or under the doctrine of equivalents, for example, by being configured to operate in accordance with section 4.2 of 3GPP TS 25.212 v6.10.0, including sections 4.2.7 and 4.2.7.2.

93.     The Accused Products satisfy '060 Element 14C of claim 14 of the '060 patent,

literally or under the doctrine of equivalents, for example, by being configured to operate in accordance with section 4.2 of 3GPP TS 25.212 v6.10.0, including sections 4.2.7 and 4.2.7.2.

94.     On or about November 21, 2015, BlackBerry notified BLU that it infringed the '060 patent by providing a list of patents required to practice, *inter alia*, the 2G, 3G, and LTE standards.  The notice contained an offer to license the '060 patent on fair, reasonable, and nondiscriminatory terms.  BLU became aware of the '060 patent at least as of this notice.

95.     On information and belief, BLU also induces infringement of at least claims 1 and 14 of the '060 patent.  BLU's Accused Products as sold are specifically configured to infringe BlackBerry's '060 patent as described above.  BLU actively instructs its customers on how to use its products, including through product manuals and advertising.  When used as instructed, BLU's customers use its products to practice the methods and use the apparatus of the '060 patent.  BLU's customers thereby directly infringe, either literally or under the doctrine of equivalents, the '060 patent.  For example, the Accused Products practice the '060 patent when an end user uses his or her device in an ordinary manner, such as to transmit or receive data over a 3G communication network.  The BLU Vivo XL sales guide, for example, informs and instructs users how to use the phone with a 3G network in an infringing manner.[3]

96.     BLU knew of the '060 patent, or should have known of the '060 patent but was willfully blind to its existence, since at least its incorporation into the 3G standard and its disclosure to 3GPP and ETSI.  BLU was made aware of its infringement through a notice letter sent from BlackBerry on November 21, 2015.  Additionally, BLU has had actual knowledge of the '060 patent since at least as early as the filing and/or service of this Complaint.

97.     As of the date of its earliest awareness of the '060 patent, BLU knew of the '060

---

[3] *See, e.g.*, *BLU Vivo XL Sales Guide* 20, Exhibit K.

patent and knew that its customers' actions taken during the ordinary and intended use of the

Accused Products would constitute infringement of the '060 patent. Alternatively, BLU

understood that there is a high probability that its customers would infringe the '060 patent but

remained willfully blind to the infringing nature of its customers' actions taken during the

ordinary and intended use of the Accused Products.

98.     BLU's infringement of the '060 patent has been and continues to be willful, and

BLU's conduct renders this case exceptional under 35 U.S.C. § 285. BlackBerry provided BLU

notice on November 21, 2015, identifying the '060 patent and the infringement by BLU's

products. Despite this notice, BLU failed to negotiate in good faith and has willfully and

deliberately continued infringing the claims of the '060 patent to the present day.

99.     Additional allegations regarding BLU's knowledge of the '060 patent and willful

infringement likely will have evidentiary support after a reasonable opportunity for discovery.

100.    By its actions, BLU has injured BlackBerry and is liable to BlackBerry for

infringement of the '060 patent pursuant to 35 U.S.C. § 271.

### THIRD CAUSE OF ACTION
**(Infringement of U.S. Patent No. 8,406,118)**

101.    BlackBerry realleges and incorporates by reference the allegations set forth in the

foregoing paragraphs.

102.    On information and belief, BLU has directly infringed and is continuing to

directly infringe the '118 patent, either literally or under the doctrine of equivalents, by making,

using, selling, offering for sale, marketing, and/or importing in the United States and in this

Judicial District, products, software, and/or services that incorporate or make use of one or more

of the inventions covered by the '118 patent, including but not limited to products or software

supporting the LTE standard, including 3GPP TS 36.211 (v8.9.0 and subsequent releases and

versions) and TS 36.300 (v8.12.0 and subsequent releases and versions).  The Accused Products therefore infringe at least claims 1 and 11 of the '118 patent.

103.    For example, on information and belief, the BLU Vivo XL contains the features and functionality designed and used to comply with the LTE standard.



*See, e.g.*, *BLU Vivo XL Sales Guide* 20, Exhibit K.

104.    On information and belief, by complying with the LTE standard and including 3GPP TS 36.211 (v8.9.0 and subsequent releases and versions) and TS 36.300 (v8.12.0 and subsequent releases and versions), the Accused LTE Products, including the BLU Vivo XL, satisfy each and every element of one or more of the claims '118 patent, including without limitation, claims 1 and 11.

105.    Claim 1 of the '118 patent recites:

A method of receiving pilot symbols in Orthogonal Frequency Division Multiplexing (OFDM) frames at an OFDM receiver having at least one receiving antenna from an OFDM base station having at least two transmitting antennas, ("'118 Element 1A")

the OFDM base station having an adjacent OFDM base station having at least two transmitting antennas, ("'118 Element 1B")

the OFDM frames having a time domain and a frequency domain, each OFDM frame comprising a plurality of OFDM symbols in the time domain and a plurality of subcarriers in the frequency domain, the method comprising: ("'118 Element 1C")

receiving scattered pilot symbols in a scattered pattern in time-frequency from each

transmitting antenna of the OFDM base station, wherein the scattered pattern is offset from a scattered pattern of the adjacent OFDM base station. ("'118 Element 1D")

106.     The Accused LTE Products satisfy '118 Element 1A of claim 1 of the '118 patent, literally or under the doctrine of equivalents, for example, by operating in accordance with section 6.2 of 3GPP TS 36.211 v8.9.0, including section 6.2.1.

107.     The Accused LTE Products satisfy '118 Element 1B of claim 1 of the '118 patent, literally or under the doctrine of equivalents, for example, by operating in accordance with section 4 of 3GPP TS 36.300 v8.12.0, as further explained by Figure 4-1 and associated text.

108.      The Accused LTE Products satisfy '118 Element 1C of claim 1 of the '118 patent, literally or under the doctrine of equivalents, for example, by operating in accordance with section 6.2 of 3GPP TS 36.211 v8.9.0, including sections 6.2.2 and 6.2.3.

109.     The Accused LTE Products satisfy '118 Element 1D of claim 1 of the '118 patent, literally or under the doctrine of equivalents, for example, by operating in accordance with section 6.10 of 3GPP TS 36.211 v8.9.0, including section 6.10.1.2.

110.     Claim 11 of the '118 patent recites:

A user equipment (UE) of a wireless network, the wireless network including a first Orthogonal Frequency Division Multiplexing (OFDM) base station having at least two transmitting antennas, ("'118 Element 11A")

the OFDM base station adjacent to a second OFDM base station having at least two transmitting antennas, the UE comprising: a receiving antenna; and ("'118 Element 11B")

a receiver configured to: receive scattered pilot symbols in a scattered pattern in time-frequency for each transmitting antenna of the first OFDM base station, wherein the scattered pattern from the first OFDM base station is offset from a scattered pattern of the second OFDM base station; and ("'118 Element 11C")

receive the scattered pilot symbols in OFDM frames from the first OFDM base station, the OFDM frames having a time domain and a frequency domain, each OFDM

frame having a plurality of OFDM symbols in the time domain and a plurality of subcarriers in the frequency domain.  ("'118 Element 11D")

111.    The Accused LTE Products satisfy '118 Element 11A of claim 11 of the '118 patent, literally or under the doctrine of equivalents, for example, by being configured to operate in accordance with section 6.2 of 3GPP TS 36.211 v8.9.0, including section 6.2.1.

112.    The Accused LTE Products satisfy '118 Element 11B of claim 11 of the '118 patent, literally or under the doctrine of equivalents, for example, by being configured to operate in accordance with section 4 of 3GPP TS 36.300 v8.12.0, as further explained by Figure 4-1 and associated text.

113.    The Accused LTE Products satisfy '118 Element 11C of claim 11 of the '118 patent, literally or under the doctrine of equivalents, for example, by being configured to operate in accordance with section 6.2 of 3GPP TS 36.211 v8.9.0, including sections 6.2.2 and 6.2.3.

114.    The Accused LTE Products satisfy '118 Element 11D of claim 11 of the '118 patent, literally or under the doctrine of equivalents, for example, by being configured to operate in accordance with section 6.10 of 3GPP TS 36.211 v8.9.0, including section 6.10.1.2.

115.    On or about November 21, 2015, BlackBerry notified BLU that it infringed the '118 patent by providing a list of patents required to practice, *inter alia*, the 2G, 3G, and LTE standards.  The notice contained an offer to license the '118 patent on fair, reasonable, and nondiscriminatory terms.  BLU became aware of the '118 patent at least as of this notice.

116.    On information and belief, BLU also induces infringement of at least claims 1 and 11 of the '118 patent.  BLU's Accused Products as sold are specifically configured to infringe BlackBerry's '118 patent as described above.  BLU actively instructs its customers on how to use its products, including through product manuals and advertising.  When used as instructed, BLU's customers use its products to practice the methods and use the apparatus of

the '118 patent.  BLU's customers thereby directly infringe, either literally or under the doctrine of equivalents, the '118 patent.  For example, the Accused Products practice the '118 patent when an end user uses his or her device in an ordinary manner, such as to transmit or receive data over a LTE communication network.  The BLU Vivo XL sales guide, for example, informs and instructs users how to use the phone with a LTE network in an infringing manner.[4]

117.     BLU knew of the '118 patent, or should have known of the '118 patent but was willfully blind to its existence, since at least its incorporation into the LTE standard and its disclosure to 3GPP and ETSI.  BLU was made aware of its infringement through a notice letter sent from BlackBerry on November 21, 2015.  Additionally, BLU has had actual knowledge of the '118 patent since at least as early as the filing and/or service of this Complaint.

118.     As of the date of its earliest awareness of the '118 patent, BLU knew of the '118 patent and knew that its customers' actions taken during the ordinary and intended use of the Accused LTE Products would constitute infringement of the '118 patent.  Alternatively, BLU understood that there is a high probability that its customers would infringe the '118 patent but remained willfully blind to the infringing nature of its customers' actions taken during the ordinary and intended use of the Accused LTE Products.

119.     BLU's infringement of the '118 patent has been and continues to be willful, and BLU's conduct renders this case exceptional under 35 U.S.C. § 285.  BlackBerry provided BLU notice on November 21, 2015, identifying the '118 patent and the infringement by BLU's products.  Despite this notice, BLU failed to negotiate in good faith and has willfully and deliberately continued infringing the claims of the '118 patent to the present day.

120.     By its actions, BLU has injured BlackBerry and is liable to BlackBerry for

---

[4] *See, e.g.*, *BLU Vivo XL Sales Guide* 20, Exhibit K.

infringement of the '118 patent pursuant to 35 U.S.C. § 271.

**FOURTH CAUSE OF ACTION**
**(Infringement of U.S. Patent No. 8,472,567)**

121.    BlackBerry realleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

122.    On information and belief, BLU has directly infringed and is continuing to directly infringe the '567 patent, either literally or under the doctrine of equivalents, by making, using, selling, offering for sale, marketing, and/or importing in the United States and in this Judicial District, products, software, and/or services that incorporate or make use of one or more of the inventions covered by the '567 patent, including but not limited to products or software supporting the LTE standard, including 3GPP TS 36.211 (v8.9.0 and subsequent releases and versions) and TS 36.212 (v8.8.0 and subsequent releases and versions) (collectively the "Accused '567 Technical Specifications").  The Accused LTE Products therefore infringe at least claims 11 and 16 of the '567 patent.

123.    For example, on information and belief, the BLU Vivo XL contains the features and functionality designed and used to comply with the LTE standard.



*See, e.g.*, *BLU Vivo XL Sales Guide* 20, Exhibit K.

124.    On information and belief, by complying with the LTE standard and the Accused '567 Technical Specifications, the Accused Products, including the BLU Vivo XL, satisfy each and every element of one or more of the claims '567 patent, including without limitation, claims 11 and 16.

125.    Claim 11 of the '567 patent recites:

A method for use with Long Term Evolution (LTE) broadcast channel data, the method comprising: receiving at least a portion of the LTE broadcast channel data from a transmitter; ("'567 Element 11A")

descrambling the at least a portion of the LTE broadcast channel data using a descrambling sequence one of a plurality of unique descrambling sequences; and ("'567 Element 11B")

determining the number of transmit antennas used by the transmitter based on the unique descrambling sequence used to descramble the at least a portion of the LTE broadcast channel data, ("'567 Element 11C")

wherein receiving at least a portion of broadcast channel data comprises receiving the at least a portion of broadcast channel data within a primary broadcast channel in accordance with a Long Term Evolution (LTE) standard.  ("'567 Element 11D")

126.    The Accused LTE Products satisfy '567 Element 11A of claim 11 of the '567 patent, literally or under the doctrine of equivalents, for example, by operating in accordance with section 5.3 of 3GPP TS 36.212 v8.8.0 (including sections 5.3.1, 5.3.1.1, and 5.3.1.3) and section 6.6 of 3GPP TS 36.211 v8.9.0.

127.    The Accused LTE Products satisfy '567 Element 11B of claim 11 of the '567 patent, literally or under the doctrine of equivalents, for example, by operating in accordance with section 5.3 of 3GPP TS 36.212 v8.8.0, including sections 5.3.1 and 5.3.1.1.

128.    The Accused LTE Products satisfy '567 Element 11C of claim 11 of the '567 patent, literally or under the doctrine of equivalents, for example, by operating in accordance with section 5.3 of 3GPP TS 36.212 v8.8.0, including sections 5.3.1 and 5.3.1.1.

129.     The Accused LTE Products satisfy '567 Element 11D of claim 11 of the '567 patent, literally or under the doctrine of equivalents, for example, by operating in accordance with section 6.6 of 3GPP TS 36.211 v8.9.0 and as further defined by 3GPP TS 36.212 v8.8.0.

130.     Claim 16 of the '567 patent recites:

A communications device for receiving Long Term Evolution (LTE) broadcast
    channel data from a transmitter in a wireless network, the communications
    device configured to: receive at least a portion of the LTE broadcast channel
    data from a transmitter; ("'567 Element 16A")

descramble the at least a portion of LTE broadcast channel data using one of a
    plurality of unique descrambling sequences; and ("'567 Element 16B")

determine the number of transmit antennas used by the transmitter based on the
    unique descrambling sequence used to descramble the at least a portion of the
    LTE broadcast channel data, ("'567 Element 16C")

wherein the communications device is further configured to receive the at least a
    portion of broadcast channel data within a primary broadcast channel in
    accordance with a Long Term Evolution (LTE) standard. ("'567 Element
    16D")

131.     The Accused LTE Products satisfy '567 Element 16A of claim 16 of the '567 patent, literally or under the doctrine of equivalents, for example, by being configured to operate in accordance with section 5.3 of 3GPP TS 36.212 v8.8.0 (including sections 5.3.1, 5.3.1.1, and 5.3.1.3) and section 6.6 of 3GPP TS 36.211 v8.9.0.

132.     The Accused LTE Products satisfy '567 Element 16B of claim 16 of the '567 patent, literally or under the doctrine of equivalents, for example, by being configured to operate in accordance with section 5.3 of 3GPP TS 36.212 v8.8.0, including sections 5.3.1 and 5.3.1.1.

133.     The Accused LTE Products satisfy '567 Element 16C of claim 16 of the '567 patent, literally or under the doctrine of equivalents, for example, by being configured to operate in accordance with section 5.3 of 3GPP TS 36.212 v8.8.0, including sections 5.3.1 and 5.3.1.1.

134.     The Accused LTE Products satisfy '567 Element 16D of claim 16 of the '567

patent, literally or under the doctrine of equivalents, for example, by being configured to operate in accordance with section 6.6 of 3GPP TS 36.211 v8.9.0 and as further defined by 3GPP TS 36.212 v8.8.0.

135.    On or about November 21, 2015, BlackBerry notified BLU that it infringed the '567 patent by providing a list of patents required to practice, *inter alia*, the 2G, 3G, and LTE standards.  The notice contained an offer to license the '567 patent on fair, reasonable, and nondiscriminatory terms.  BLU became aware of the '567 patent at least as of this notice.

136.    On information and belief, BLU also induces infringement of at least claims 11 and 16 of the '567 patent.  BLU's Accused LTE Products as sold are specifically configured to infringe BlackBerry's '567 patent as described above.  BLU actively instructs its customers on how to use its products, including through product manuals and advertising.  When used as instructed, BLU's customers use its products to practice the methods and use the apparatus of the '567 patent.  BLU's customers thereby directly infringe, either literally or under the doctrine of equivalents, the '567 patent.  For example, the Accused LTE Products practice the '567 patent when an end user uses his or her device in an ordinary manner, such as to transmit or receive data over a LTE communication network.  The BLU Vivo XL sales guide, for example, informs and instructs users how to use the phone with a LTE network in an infringing manner.[5]

137.    BLU knew of the '567 patent, or should have known of the '567 patent but was willfully blind to its existence, since at least its incorporation into the LTE standard and its disclosure to 3GPP and ETSI.  BLU was made aware of its infringement through a notice letter sent from BlackBerry on November 21, 2015.  Additionally, BLU has had actual knowledge of the '567 patent since at least as early as the filing and/or service of this Complaint.

---

[5] *See, e.g.*, *BLU Vivo XL Sales Guide* 20, Exhibit K.

138.    As of the date of its earliest awareness of the '567 patent, BLU knew of the '567 patent and knew that its customers' actions taken during the ordinary and intended use of the Accused LTE Products would constitute infringement of the '567 patent.  Alternatively, BLU understood that there is a high probability that its customers would infringe the '567 patent but remained willfully blind to the infringing nature of its customers' actions taken during the ordinary and intended use of the Accused LTE Products.

139.    BLU's infringement of the '567 patent has been and continues to be willful, and BLU's conduct renders this case exceptional under 35 U.S.C. § 285.  BlackBerry provided BLU notice on November 21, 2015, identifying the '567 patent and the infringement by BLU's products.  Despite this notice, BLU failed to negotiate in good faith and has willfully and deliberately continued infringing the claims of the '567 patent to the present day.

140.    Additional allegations regarding BLU's knowledge of the '567 patent and willful infringement likely will have evidentiary support after a reasonable opportunity for discovery.

141.    By its actions, BLU has injured BlackBerry and is liable to BlackBerry for infringement of the '567 patent pursuant to 35 U.S.C. § 271.

**FIFTH CAUSE OF ACTION**
**(Infringement of U.S. Patent No. 8,265,034)**

142.    BlackBerry realleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

143.    On information and belief, BLU has directly infringed and is continuing to directly infringe the '034 patent, either literally or under the doctrine of equivalents, by making, using, selling, offering for sale, marketing, and/or importing in the United States and in this Judicial District, products, software, and/or services that incorporate or make use of one or more of the inventions covered by the '034 patent, including but not limited to products or software

supporting the 3G standard, including 3GPP TS 25.331 (v8.19.0 and subsequent releases and versions).  The Accused Products therefore infringe at least claims 1 and 20 of the '034 patent.

144.    For example, on information and belief, the BLU Vivo XL contains the features and functionality designed and used to comply with the 3G standard.



*See, e.g.*, *BLU Vivo XL Sales Guide* 20, Exhibit K.

145.    On information and belief, the Accused Products, including the BLU Vivo XL, comply with 3GPP TS 25.331 (v8.19.0 and subsequent releases and versions) when implementing the 3G standard.

146.    On information and belief, by complying with the 3G standard and 3GPP TS 25.331 (v8.19.0 and subsequent releases and versions), the Accused Products, including the BLU Vivo XL, satisfy each and every element of one or more of the claims '034 patent, including without limitation, claims 1 and 20.

147.    Claim 1 of the '034 patent recites:

A method comprising: responsive to an indication from an upper layer of a user equipment (UE) that no more data is expected, ("'034 Element 1A")

setting a cause in a signaling connection release indication message to UE Requested Packet Switched (PS) Data session end; ("'034 Element 1B")

transmitting, from the user equipment to a wireless network on a Dedicated

Control Channel (DCCH) using Acknowledged Mode (AM) Radio Link
Control (RLC), the signaling connection release message including the cause
for a network-controlled transition; and ("'034 Element 1C")

receiving a state transition message from the wireless network. ("'034 Element
1D")

148.    The Accused Products satisfy '034 Element 1A of claim 1 of the '034 patent,

literally or under the doctrine of equivalents, for example, by operating in accordance with

section 8.1 of 3GPP TS 25.331 v8.19.0, including section 8.1.14.

149.    The Accused Products satisfy '034 Element 1B of claim 1 of the '034 patent,

literally or under the doctrine of equivalents, for example, by operating in accordance with

section 8.1 of 3GPP TS 25.331 v8.19.0, including section 8.1.14.

150.    The Accused Products satisfy '034 Element 1C of claim 1 of the '034 patent,

literally or under the doctrine of equivalents, for example, by operating in accordance with

section 8.1 of 3GPP TS 25.331 v8.19.0, including section 8.1.14.

151.    The Accused Products satisfy '034 Element 1D of claim 1 of the '034 patent,

literally or under the doctrine of equivalents, for example, by operating in accordance with

section 8.1 of 3GPP TS 25.331 v8.19.0 (including section 8.1.14), section 8.2 of 3GPP TS

25.331 v8.19.0 (including the figures in 8.2.2 and associated text and section 8.2.2.3), section

8.6.3 of 3GPP TS 25.331 v8.19.0 (including section 8.6.3.3), section 10.2 of 3GPP TS 25.331

v8.19.0 (including section 10.2.30), and section 10.3.3 of 3GPP TS 25.331 v8.19.0 (including

section 10.3.3.35a).

152.    Claim 20 of the '034 patent recites:

A user equipment (UE) having a radio subsystem, a processor adapted to interact
with a memory, the radio subsystem, and a user interface, the UE configured
to: responsive to an indication from an upper layer of the UE, ("'034 Element
20A")

set a cause in a signaling connection release indication message to UE Requested
Packet Switched (PS) Data session end; ("'034 Element 20B")

transmit, to a wireless network on a Dedicated Control Channel (DCCH) using
Acknowledged Mode (AM) Radio Link Control (RLC), the signaling
connection release indication message including the cause for a network-
controlled transition; and ("'034 Element 20C")

receive a state transition message from the wireless network. ("'034 Element
20D")

153.    The Accused Products satisfy '034 Element 20A of claim 20 of the '034 patent,
literally or under the doctrine of equivalents, for example, by being configured to operate in
accordance with section 8.1 of 3GPP TS 25.331 v8.19.0, including section 8.1.14.

154.    The Accused Products satisfy '034 Element 20B of claim 20 of the '034 patent,
literally or under the doctrine of equivalents, for example, by being configured to operate in
accordance with section 8.1 of 3GPP TS 25.331 v8.19.0, including section 8.1.14.

155.    The Accused Products satisfy '034 Element 20C of claim 20 of the '034 patent,
literally or under the doctrine of equivalents, for example, by being configured to operate in
accordance with section 8.1 of 3GPP TS 25.331 v8.19.0, including section 8.1.14.

156.    The Accused Products satisfy '034 Element 20D of claim 20 of the '034 patent,
literally or under the doctrine of equivalents, for example, by being configured to operate in
accordance with section 8.1 of 3GPP TS 25.331 v8.19.0 (including section 8.1.14), section 8.2
of 3GPP TS 25.331 v8.19.0 (including the figures in 8.2.2 and associated text and section
8.2.2.3), section 8.6.3 of 3GPP TS 25.331 v8.19.0 (including section 8.6.3.3), section 10.2 of
3GPP TS 25.331 v8.19.0 (including section 10.2.30), and section 10.3.3 of 3GPP TS 25.331
v8.19.0 (including section 10.3.3.35a).

157.    On or about November 21, 2015, BlackBerry notified BLU that it infringed the
'034 patent by providing a list of patents required to practice, *inter alia*, the 2G, 3G, and LTE

standards.  The notice contained an offer to license the '034 patent on fair, reasonable, and nondiscriminatory terms.  BLU became aware of the '034 patent at least as of this notice.

158.    On information and belief, BLU also induces infringement of at least claims 1 and 20 of the '034 patent.  BLU's Accused Products as sold are specifically configured to infringe BlackBerry's '034 patent as described above.  BLU actively instructs its customers on how to use its products, including through product manuals and advertising.  When used as instructed, BLU's customers use its products to practice the methods and use the apparatus of the '034 patent.  BLU's customers thereby directly infringe, either literally or under the doctrine of equivalents, the '034 patent.  For example, the Accused Products practice the '034 patent when an end user uses his or her device in an ordinary manner, such as to transmit or receive data over a 3G communication network.  The BLU Vivo XL sales guide, for example, informs and instructs users how to use the phone with a 3G network in an infringing manner.[6]

159.    BLU knew of the '034 patent, or should have known of the '034 patent but was willfully blind to its existence, since at least its incorporation into the 3G standard and its disclosure to 3GPP and ETSI.  BLU was made aware of its infringement through a notice letter sent from BlackBerry on November 21, 2015.  Additionally, BLU has had actual knowledge of the '034 patent since at least as early as the filing and/or service of this Complaint.

160.    As of the date of its earliest awareness of the '034 patent, BLU knew of the '034 patent and knew that its customers' actions taken during the ordinary and intended use of the Accused Products would constitute infringement of the '034 patent.  Alternatively, BLU understood that there is a high probability that its customers would infringe the '034 patent but remained willfully blind to the infringing nature of its customers' actions taken during the

---

[6] *See, e.g.*, *BLU Vivo XL Sales Guide* 20, Exhibit K.

ordinary and intended use of the Accused Products.

161.    BLU's infringement of the '034 patent has been and continues to be willful, and BLU's conduct renders this case exceptional under 35 U.S.C. § 285.  BlackBerry provided BLU notice on November 21, 2015, identifying the '034 patent and the infringement by BLU's products.  Despite this notice, BLU failed to negotiate in good faith and has willfully and deliberately continued infringing the claims of the '034 patent to the present day.

162.    Additional allegations regarding BLU's knowledge of the '034 patent and willful infringement likely will have evidentiary support after a reasonable opportunity for discovery.

163.    By its actions, BLU has injured BlackBerry and is liable to BlackBerry for infringement of the '034 patent pursuant to 35 U.S.C. § 271.

## SIXTH CAUSE OF ACTION
### (Infringement of U.S. Patent No. 8,625,506)

164.    BlackBerry realleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

165.    On information and belief, BLU has directly infringed and is continuing to directly infringe the '506 patent, either literally or under the doctrine of equivalents, by making, using, selling, offering for sale, marketing, and/or importing in the United States and in this Judicial District, products, software, and/or services that incorporate or make use of one or more of the inventions covered by the '506 patent, including but not limited to products or software supporting the LTE standard, including 3GPP TS 24.301 (v8.10.0 and subsequent releases and versions) and TS 36.300 (v8.12.0 and subsequent releases and versions).  The Accused Products therefore infringe at least claims 1 and 9 of the '506 patent.

166.    For example, on information and belief, the BLU Vivo XL contains the features and functionality designed and used to comply with the LTE standard.



*See, e.g.*, *BLU Vivo XL Sales Guide* 20, Exhibit K.

167. On information and belief, by complying with the LTE standard and 3GPP TS 24.301 (v8.10.0 and subsequent releases and versions) and TS 36.300 (v8.12.0 and subsequent releases and versions), the Accused LTE Products, including the BLU Vivo XL, satisfy each and every element of one or more of the claims '506 patent, including without limitation, claims 1 and 9.

168. Claim 1 of the '506 patent recites:

A user agent equipment for operation in an evolved packet system (EPS), the user agent equipment comprising: ("'506 Preamble 1")

a non-access stratum (NAS) protocol layer configured to generate a NAS service request message comprising an EXTENDED SERVICE REQUEST and identifying a service type related to circuit-switched (CS) fallback; and ("'506 Element 1A")

an access stratum (AS) protocol layer configured to set a radio resource control (RRC) establishment cause (EC) of an RRC CONNECTION REQUEST message, the EC based upon the service type related to CS fallback identified by the NAS service request message, ("'506 Element 1B")

wherein when the service type is "mobile originating (MO) CS fallback", the RRC EC is set to "MO data".  ("'506 Element 1C")

169. To the extent the preamble is considered a limitation, the Accused LTE Products satisfy the '506 Preamble 1 of claim 1 the '506 patent, literally or under the doctrine of

equivalents, for example, by being configured to operate in accordance with section 1 of 3GPP TS 24.301 v8.10.0.

170.    The Accused LTE Products satisfy '506 Element 1A of claim 1 of the '506 patent, literally or under the doctrine of equivalents, for example, by being configured to operate in accordance with section 4.3 of 3GPP TS 36.300 v8.12.0 (including section 4.3.2), section 1 of 3GPP TS 24.301 v8.10.0, section 5.3 of 3GPP TS 24.301 v8.10.0 (including section 5.3.1), section 8.2.15 of 3GPP TS 24.301 v8.10.0, and section 9.9.3.27 of 3GPP TS 24.301 v8.10.0.

171.    The Accused LTE Products satisfy '506 Element 1B of claim 1 of the '506 patent, literally or under the doctrine of equivalents, for example, by being configured to operate in accordance with section 4.3 of 3GPP TS 36.300 v8.12.0 (including section 4.3.2), Annex D of 3GPP TS 24.301 v8.10.0 (including section D.1), and section 5.3.3 of 3GPP TS 36.331 v8.16.0 (including section 5.3.3).

172.    The Accused LTE Products satisfy '506 Element 1C of claim 1 of the '506 patent, literally or under the doctrine of equivalents, for example, by being configured to operate in accordance with Annex D of 3GPP TS 24.301 v8.10.0, including section D.1.

173.    Claim 9 of the '506 patent recites

A method in an evolved packet system (EPS), comprising: ("'506 Preamble 9")

generating, in a non-access stratum (NAS) protocol layer, a NAS service request message comprising an EXTENDED SERVICE REQUEST and identifying a service type related to circuit-switched (CS) fallback; and ("'506 Element 9A")

setting, in an access stratum (AS) protocol layer, a radio resource control (RRC) establishment cause (EC) of an RRC CONNECTION REQUEST message, the EC based upon the service type related to CS fallback identified by the NAS service request message, ("'506 Element 9B")

wherein when a service type of "mobile originating (MO) CS fallback" is generated, setting the RRC EC to "MO data". ("'506 Element 9C")

174.    To the extent the preamble is considered a limitation, the Accused LTE Products satisfy the '506 Preamble 9 of claim 9 the '506 patent, literally or under the doctrine of equivalents, for example, by operating in accordance with section 1 of 3GPP TS 24.301 v8.10.0.

175.    The Accused LTE Products satisfy '506 Element 9A of claim 9 of the '506 patent, literally or under the doctrine of equivalents, for example, by operating in accordance with section 4.3 of 3GPP TS 36.300 v8.12.0 (including section 4.3.2), section 1 of 3GPP TS 24.301 v8.10.0, section 5.3 of 3GPP TS 24.301 v8.10.0 (including section 5.3.1), section 8.2.15 of 3GPP TS 24.301 v8.10.0, and section 9.9.3.27 of 3GPP TS 24.301 v8.10.0.

176.    The Accused LTE Products satisfy '506 Element 9B of claim 9 of the '506 patent, literally or under the doctrine of equivalents, for example, by operating in accordance with section 4.3 of 3GPP TS 36.300 v8.12.0 (including section 4.3.2), Annex D of 3GPP TS 24.301 v8.10.0 (including section D.1), and section 5.3.3 of 3GPP TS 36.331 v8.16.0 (including section 5.3.3).

177.    The Accused LTE Products satisfy '506 Element 9C of claim 9 of the '506 patent, literally or under the doctrine of equivalents, for example, by operating in accordance with Annex D of 3GPP TS 24.301 v8.10.0, including section D.1.

178.    On or about November 21, 2015, BlackBerry notified BLU that it infringed the '506 patent by providing a list of patents required to practice, *inter alia*, the 2G, 3G, and LTE standards.  The notice contained an offer to license the '506 patent on fair, reasonable, and nondiscriminatory terms.

179.    On information and belief, BLU also induces infringement of at least claims 1 and 9 of the '506 patent.  BLU's Accused Products as sold are specifically configured to infringe BlackBerry's '506 patent as described above.  BLU actively instructs its customers on

how to use its products, including through product manuals and advertising.  When used as instructed, BLU's customers use its products to practice the methods and use the apparatus of the '506 patent.  BLU's customers thereby directly infringe, either literally or under the doctrine of equivalents, the '506 patent.  For example, the Accused Products practice the '506 patent when an end user uses his or her device in an ordinary manner, such as to transmit or receive data over a LTE communication network.  The BLU Vivo XL sales guide, for example, informs and instructs users how to use the phone with a LTE network in an infringing manner.[7]

180.    BLU knew of the '506 patent, or should have known of the '506 patent but was willfully blind to its existence, since at least its incorporation into the LTE standard and its disclosure to 3GPP and ETSI.  BLU was made aware of its infringement through a notice letter sent from BlackBerry on November 21, 2015.  Additionally, BLU has had actual knowledge of the '506 patent since at least as early as the filing and/or service of this Complaint.

181.    As of the date of its earliest awareness of the '506 patent, BLU knew of the '506 patent and knew that its customers' actions taken during the ordinary and intended use of the Accused LTE Products would constitute infringement of the '506 patent.  Alternatively, BLU understood that there is a high probability that its customers would infringe the '506 patent but remained willfully blind to the infringing nature of its customers' actions taken during the ordinary and intended use of the Accused LTE Products.

182.    BLU's infringement of the '506 patent has been and continues to be willful, and BLU's conduct renders this case exceptional under 35 U.S.C. § 285.  BlackBerry provided BLU notice on November 21, 2015, identifying the '506 patent and the infringement by BLU's products.  Despite this notice, BLU failed to negotiate in good faith and has willfully and

---

[7] *See, e.g.*, *BLU Vivo XL Sales Guide* 20, Exhibit K.

deliberately continued infringing the claims of the '506 patent to the present day.

183.    By its actions, BLU has injured BlackBerry and is liable to BlackBerry for infringement of the '506 patent pursuant to 35 U.S.C. § 271.

**SEVENTH CAUSE OF ACTION**
**(Infringement of U.S. Patent No. 7,933,355)**

184.    BlackBerry realleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

185.    On information and belief, BLU has directly infringed and is continuing to directly infringe the '355 patent, either literally or under the doctrine of equivalents, by making, using, selling, offering for sale, marketing, and/or importing in the United States and in this Judicial District, products, software, and/or services that incorporate or make use of one or more of the inventions covered by the '355 patent, including but not limited to products or software supporting the 2G standard, including 3GPP TS 44.018 (v9.9.0 and subsequent releases and versions), TS 45.001 (v.9.3.0 and subsequent releases and versions), and TS 45.002 (v9.5.0 and subsequent releases and versions) (collectively the "Accused '355 Technical Specifications"). The Accused Products therefore infringe at least claim 1 of the '355 patent.

186.    For example, on information and belief, the BLU Vivo XL contains the features and functionality designed and used to comply with the 2G standard.

187.    On information and belief, the Accused Products, including the BLU Vivo XL, comply with the Accused '355 Technical Specifications when implementing the 2G standard.

188.    On information and belief, by complying with the 2G standard and the Accused '355 Technical Specifications, the Accused Products, including the BLU Vivo XL, satisfy each and every element of one or more of the claims '355 patent, including without limitation, claim 1.

189.   Claim 1 of the '355 patent recites:

A device comprising: a training sequence repository containing at least one
training sequence from a set of training sequences consisting of:

| Training Sequence |
| --- |
| 0 1 1 0 0 0 1 0 0 0 1 0 0 1 0 0 1 1 1 1 0 1 0 1 1 1 |
| 0 1 0 1 1 1 1 0 1 0 0 1 1 0 1 1 1 0 1 1 1 0 0 0 0 1 |
| 0 1 0 0 0 0 0 1 0 1 1 0 0 0 1 1 1 0 1 1 1 0 1 1 0 0 |
| 0 0 1 0 1 1 0 1 1 1 0 1 1 1 0 0 1 1 1 0 1 0 0 0 0 0 |
| 0 1 1 1 0 1 0 0 1 1 1 1 0 1 0 0 1 1 1 0 1 1 1 1 1 0 |
| 0 1 0 0 0 0 0 1 0 0 1 1 1 0 1 0 1 0 0 1 1 1 1 0 0 1 1 |
| 0 0 0 1 0 0 0 0 1 1 0 1 0 0 0 0 1 1 0 1 1 1 0 1 0 1 |
| 0 1 0 0 0 1 0 1 1 1 0 0 1 1 1 1 1 1 0 0 1 0 1 0 0 1 |

and; ("'355 Element 1A")

a transmitter configured to transmit the at least one training sequence. ("'355
Element 1B")

190.   The Accused Products satisfy '355 Element 1A of claim 1 of the '355 patent,
literally or under the doctrine of equivalents, for example, by being configured to operate in
accordance with section 13 of 3GPP TS 45.001 v9.3.0 and section 5.2 of 3GPP TS 45.002
v9.5.0, including section 5.2.3.

191.   The Accused Products satisfy '355 Element 1B of claim 1 of the '355 patent,
literally or under the doctrine of equivalents, for example, by being configured to operate in
accordance with section 13 of 3GPP TS 45.001 v9.3.0, section 5.2 of 3GPP TS 45.002 v9.5.0
(including section 5.2.3), section 9.1 of 3GPP TS 44.018 v9.9.0 (including section 9.1.18), and
section 10.5.2 of 3GPP TS 44.018 v9.9.0 (including section 10.5.2.5).

192.   On or about November 21, 2015, BlackBerry notified BLU that it infringed the
'355 patent by providing a list of patents required to practice, *inter alia*, the 2G, 3G, and LTE
standards.  The notice contained an offer to license the '355 patent on fair, reasonable, and
nondiscriminatory terms.  BLU became aware of the '355 patent at least as of this notice.

193.   On information and belief, BLU also induces infringement of at least claim 1 of
the '355 patent.  BLU's Accused Products as sold are specifically configured to infringe

BlackBerry's '355 patent as described above.  BLU actively instructs its customers on how to use its products, including through product manuals and advertising.  When used as instructed, BLU's customers use its products to practice the methods and use the apparatus of the '355 patent.  BLU's customers thereby directly infringe, either literally or under the doctrine of equivalents, the '355 patent.  For example, the Accused Products practice the '355 patent when an end user uses his or her device in an ordinary manner, such as to transmit or receive data over a 2G communication network.  On information and belief, BLU informs and instructs its customers and users how to use the phone with a 2G network in an infringing manner.

194.    BLU knew of the '355 patent, or should have known of the '355 patent but was willfully blind to its existence, since at least its incorporation into the 2G standard and its disclosure to 3GPP and ETSI.  BLU was made aware of its infringement through a notice letter sent from BlackBerry on November 21, 2015.  Additionally, BLU has had actual knowledge of the '355 patent since at least as early as the filing and/or service of this Complaint.

195.    As of the date of its earliest awareness of the '355 patent, BLU knew of the '355 patent and knew that its customers' actions taken during the ordinary and intended use of the Accused Products would constitute infringement of the '355 patent.  Alternatively, BLU understood that there is a high probability that its customers would infringe the '355 patent but remained willfully blind to the infringing nature of its customers' actions taken during the ordinary and intended use of the Accused Products.

196.    BLU's infringement of the '355 patent has been and continues to be willful, and BLU's conduct renders this case exceptional under 35 U.S.C. § 285.  BlackBerry provided BLU notice on November 21, 2015, identifying the '355 patent and the infringement by BLU's products.  Despite this notice, BLU failed to negotiate in good faith and has willfully and

deliberately continued infringing the claims of the '355 patent to the present day.

197.     Additional allegations regarding BLU's knowledge of the '355 patent and willful infringement likely will have evidentiary support after a reasonable opportunity for discovery.

198.     By its actions, BLU has injured BlackBerry and is liable to BlackBerry for infringement of the '355 patent pursuant to 35 U.S.C. § 271.

**EIGHTH CAUSE OF ACTION**
**(Infringement of U.S. Patent No. 7,050,413)**

199.     BlackBerry realleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

200.     On information and belief, BLU has directly infringed and is continuing to directly infringe the '413 patent, either literally or under the doctrine of equivalents, by making, using, selling, offering for sale, marketing, and/or importing in the United States and in this Judicial District, products, software, and/or services that incorporate or make use of one or more of the inventions covered by the '413 patent, including but not limited to products or software supporting the 3G standard, including 3GPP TS 25.211 (v6.10.0 and subsequent releases and versions), TS 25.212 (v6.10.0 and subsequent releases and versions), TS 25.321 (v6.18.0 and subsequent releases and versions), and TS 25.214 (v6.11.0. and subsequent releases and versions) (collectively the "Accused '413 Technical Specifications").  The Accused Products therefore infringe at least claims 1 and 4 of the '413 patent.

201.     For example, on information and belief, the BLU Vivo XL contains the features and functionality designed and used to comply with the 3G standard.



*See, e.g.*, *BLU Vivo XL Sales Guide* 20, Exhibit K.

202.    On information and belief, by complying with the 3G standard and Accused '413

Technical Specifications, the Accused Products, including the BLU Vivo XL, satisfy each and

every element of one or more of the claims '413 patent, including without limitation, claims 1

and 4.

203.    Claim 1 of the '413 patent recites:

A mobile station configured to perform code division multiple access
    communication using a plurality of channelization codes, comprising: ("'413
    Preamble 1")

a receiver configured to receive a number of the channelization codes assigned to
    the mobile station, a modulation scheme for use in the code division multiple
    access, and an identification code corresponding to a transport block set size;
    and ("'413 Element 1A")

an identifier configured to identify the transport block set size based on the
    number of the channelization codes, the modulation scheme for use in the
    code division multiple access, and the identification code corresponding to
    the transport block set size, which are received. ("'413 Element 1B")

204.    To the extent the preamble is considered a limitation, the Accused Products

satisfy the '413 Preamble 1 of claim 1 the '413 patent, literally or under the doctrine of

equivalents, for example, by being configured to operate in accordance with section 5.3.3 of

3GPP TS 25.211 v6.10.0, including section 5.3.3.13.

205.     The Accused Products satisfy '413 Element 1A of claim 1 of the '413 patent, literally or under the doctrine of equivalents, for example, by being configured to operate in accordance with section 6A of 3GPP TS 25.214 v6.11.0, including section 6A.1, and section 4.6 of 3GPP TS 25.212 v6.10.0, including section 4.6.2.

206.     The Accused Products satisfy '413 Element 1B of claim 1 of the '413 patent, literally or under the doctrine of equivalents, for example, by being configured to operate in accordance with section 8 of 3GPP TS 25.321 v6.18.0 (including section 8.1), section 9.2 of 3GPP TS 25.321 v6.18.0 (including section 9.2.3), and section 6A of 3GPP TS 25.214 v6.11.0 (including section 6A.1).

207.     Claim 4 of the '413 patent recites

An information communication method for performing code division multiple access communication between a base station and mobile stations using a plurality of channelization codes, comprising the steps of: ("'413 Preamble 4")

receiving a number of the channelization codes assigned to a mobile station, a modulation scheme for use in the code division multiple access, and an identification code corresponding to a transport block set size; ("'413 Element 4A")

and identifying the transport block set size based on the number of the channelization codes, the modulation scheme for use in the code division multiple access, and the identification code corresponding to the transport block set size. ("'413 Element 4B")

208.     To the extent the preamble is considered a limitation, the Accused Products satisfy the '413 Preamble 4 of claim 4 the '413 patent, literally or under the doctrine of equivalents, for example, by operating in accordance with section 5.3.3 of 3GPP TS 25.211 v6.10.0, including section 5.3.3.13.

209.     The Accused Products satisfy '413 Element 4A of claim 4 of the '413 patent, literally or under the doctrine of equivalents, for example, by operating in accordance with

section 6A of 3GPP TS 25.214 v6.11.0, including section 6A.1, and section 4.6 of 3GPP TS 25.212 v6.10.0, including section 4.6.2.

210.    The Accused Products satisfy '413 Element 4B of claim 4 of the '413 patent, literally or under the doctrine of equivalents, for example, by operating in accordance with section 8 of 3GPP TS 25.321 v6.18.0 (including section 8.1), section 9.2 of 3GPP TS 25.321 v6.18.0 (including section 9.2.3), and section 6A of 3GPP TS 25.214 v6.11.0  (including section 6A.1).

211.    On or about November 21, 2015, BlackBerry notified BLU that it infringed the '413 patent by providing a list of patents required to practice, *inter alia*, the 2G, 3G, and LTE standards.  The notice contained an offer to license the '413 patent on fair, reasonable, and nondiscriminatory terms.

212.    On information and belief, BLU also induces infringement of at least claims 1 and 4 of the '413 patent.  BLU's Accused Products as sold are specifically configured to infringe BlackBerry's '413 patent as described above.  BLU actively instructs its customers on how to use its products, including through product manuals and advertising.  When used as instructed, BLU's customers use its products to practice the methods and use the apparatus of the '413 patent.  BLU's customers thereby directly infringe, either literally or under the doctrine of equivalents, the '413 patent.  For example, the Accused Products practice the '413 patent when an end user uses his or her device in an ordinary manner, such as to transmit or receive data over a 3G communication network.  The BLU Vivo XL sales guide, for example, informs and instructs users how to use the phone with a 3G network in an infringing manner.[8]

213.    BLU knew of the '413 patent, or should have known of the '413 patent but was

---

[8] *See, e.g.*, *BLU Vivo XL Sales Guide* 20, Exhibit K.

willfully blind to its existence, since at least its incorporation into the 3G standard and its disclosure to 3GPP and ETSI.  BLU was made aware of its infringement through a notice letter sent from BlackBerry on November 21, 2015.  Additionally, BLU has had actual knowledge of the '413 patent since at least as early as the filing and/or service of this Complaint.

214.    As of the date of its earliest awareness of the '413 patent, BLU knew of the '413 patent and knew that its customers' actions taken during the ordinary and intended use of the Accused Products would constitute infringement of the '413 patent.  Alternatively, BLU understood that there is a high probability that its customers would infringe the '413 patent but remained willfully blind to the infringing nature of its customers' actions taken during the ordinary and intended use of the Accused Products.

215.    BLU's infringement of the '413 patent has been and continues to be willful, and BLU's conduct renders this case exceptional under 35 U.S.C. § 285.  BlackBerry provided BLU notice on November 21, 2015, identifying the '413 patent and the infringement by BLU's products.  Despite this notice, BLU failed to negotiate in good faith and has willfully and deliberately continued infringing the claims of the '413 patent to the present day.

216.    By its actions, BLU has injured BlackBerry and is liable to BlackBerry for infringement of the '413 patent pursuant to 35 U.S.C. § 271.

## PRAYER FOR RELIEF

WHEREFORE, BlackBerry prays that this Court enter judgment against BLU as follows:

A.    Adjudge and decree that BLU has infringed each of the Asserted Patents;

B.    Adjudge and decree that BLU's infringement of each of the Asserted Patents has been willful;

C.      Adjudge and decree that each of the Asserted Patents is valid and enforceable;

D.      Award to BlackBerry damages adequate to compensate BlackBerry for the patent infringement that has occurred, together with interest and costs;

E.      Award to BlackBerry an ongoing royalty for BLU's post-verdict infringement, payable on each product or service offered by BLU that is found to infringe one or more of the patents asserted herein, and on all future products and services that are not colorably different from those found to infringe;

F.      Award to BlackBerry all other damages permitted by 35 U.S.C. § 284, including increased damages up to three times the amount of compensatory damages found;

G.      Find that this is an exceptional case and award to BlackBerry its costs and reasonable attorneys' fees incurred in this action as provided by 35 U.S.C. § 285; and

H.      Award to BlackBerry such other and further relief, including other monetary and equitable relief, as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), BlackBerry demands a trial by jury on all claims and issues so triable.

Dated: August 16, 2016       By: _/s/ Marcos Daniel Jiménez_

Marcos Daniel Jiménez (FBN 441503)
mjimenez@mwe.com
Audrey M. Pumariega (FBN 85206)
apumariega@mwe.com
McDERMOTT WILL & EMERY LLP
333 SE 2nd Avenue, Suite 4500
Miami, Florida 33131
Telephone: 305 358 3500
Facsimile: 305 347 6500

Scott R. Lassar (_pro hac vice pending_)
slassar@sidley.com
David T. Pritikin (_pro hac vice pending_)
dpritikin@sidley.com
Douglas I. Lewis (_pro hac vice pending_)
dilewis@sidley.com
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, Illinois 60603
Telephone: 1 312 853 7000
Facsimile: 1 312 853 7036

Ching-Lee Fukuda (_pro hac vice pending_)
clfukuda@sidley.com
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
Telephone: 1 212 839 5300
Facsimile: 1 212 839 5599

Thomas N. Tarnay (_pro hac vice pending_)
ttarnay@sidley.com
SIDLEY AUSTIN LLP
2001 Ross Avenue, Suite 3600
Dallas, Texas 75201
Telephone: 1 214 981 3300
Facsimile: 1 214 981 3400

_Attorneys for Plaintiff BlackBerry Limited_